We have four cases this morning and one this afternoon. And the first of this morning's cases is number 18-1462. Contreras Aybar v. Secretary Department of Homeland Security. Is it ZHU or ZHU? ZHU. ZHU. And Mr. Hlaska. Or Alaska. Is it Alaska? Yes, Your Honor. Just like the state with H. Okay. Thank you. ZHU. Whenever you're ready, Counsel. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Benjamin Zhu on behalf of Appellants Carmen Josefina Contreras Aybar and Dario De Jesus Murata Contreras. With the Court's permission, I'd like to request three minutes for rebuttal. That's fine. Thank you. At the outset of her decision below, Judge Stiles states that the facts of this case are tragic and unfortunately so is the result. And the result reached by the district court. Just a second. Can you pull down the mic, Judge? Of course. I may be starting at the end here, but there are avenues, are there not, for a path to citizenship for an adult child in this particular circumstance? Judge Sirica, yes, there are.  Those avenues are really in no way equivalent to the avenue provided for by Congress. Because of the numerical visa problem? Exactly. Because the long queues, because I believe the current estimate is actually something like seven years for an individual in a plaintiff's position, in a daughter's position. And so it's an avenue for relief that's in really no way equivalent to the relief that Congress intended to provide through Section 1255M3 to individuals like appellants in this case. How do we get around the fact that in 2013 Congress did change and undo, if you will, the age out for the current U visa holders? How do we get around that fact? They had to legislate with knowledge that there was a regulation for the LPR ones. What do we do with that? Judge Rundell, as explained in the amicus brief filed by Her Justice, I think the lesson to take away from the 2013 amendments is that Congress corrected the government's mistaken imposition of an age out rule in the context of derivative U visa applicants. To be frank, as explained by Her Justice, the issue of the age out risk in the context of U visa, derivative U visa applicants, was much more visible because there were more applicants, there were significant litigation. Well, that may be an explanation, but how do we analytically get around the principle that if they legislated with the knowledge that there were these LPR, and they had to, I mean, how do we analytically get around that? The answer is that the Supreme Court and commentators have made it clear that the inference to be drawn from congressional silence is a very weak one, and it's an inference that does not overcome, for instance, when there's contrary evidence of congressional intent, as there is in this case, contrary evidence of intent. What is that contrary evidence? I think we start from the text of the statute itself, the text of Section 1255 and 3, which does not impose the specific requirement that is imposed by the age out rule. But it says they may adjust the status of a child, may adjust the status of a child, which would seem to say they cannot adjust the status of someone who is not a child, and this son was not a child when it came to the time for adjustment. Well, the full sentence, Your Honor, reads, upon approval of adjusting the status of the parent of the adjusted U visa holder, naturally read the provision, the best reading of the provision really is that the eligibility and the authority of the secretary to adjust the status of a child arises upon the adjustment, upon the adjustment of status of the parent for an immediate relative of the parent. But isn't it more likely upon the adjustment you can petition, correct? That's kind of the window to attempting to adjust. That's one potential reading, but the best reading, especially given that there's this entire clause that there's no separation, that's not separated by any commas or any other type of linguistic separation, the best reading really is that the eligibility and the authority arises upon the approval of the parent. If there's another good reading, are we in Chevron Step 2 then? The best reading is really, even assuming that we are in Chevron Step 2, the regulation certainly is not a permissible reading of the statute for the reasons submitted. Let's assume we think that it might be permissible. Well, the regulation, even under Chevron Step 2, it's clear that the regulation must be a permissible and reasonable interpretation of the statute. And given the number of absurd consequences that result from the regulation, and these absurd consequences really have severe and undue consequences for the individuals whom the statute is intended to protect, the regulation really is not a permissible interpretation. But the absurd consequences are that someone ages out of the ability to get relief, and there are numerous regulations that permit that. And that's what happened here. He aged out. So how is it absurd? It's absurd.  It's that it's impossible, fundamentally impossible, for applicants or for the government to know when someone is actually eligible for relief and when someone must file in order to obtain relief. It's also entirely possible for someone who is well under the age of 21 at the time of filing to be deemed ineligible solely because of a factor that's entirely outside the applicant's control, solely because of the government's delay in processing. It's very telling, indeed, that throughout this litigation, the government still has not explained when plaintiffs here could have filed in order to ensure eligibility for relief. And, in fact, if you look at the timeline, it would have been impossible, effectively impossible, for Dario to qualify even if plaintiffs had filed at the earliest possible date. Because of the delay? I'm sorry? Because of the delay in processing? Exactly, Judge Serica. Because it took the government eight months just to process the I-929 petition. And at the time that the petition had been revoked, the I-45 petition had been pending for 11 months without final adjudication. In Cuellar de Osorio, the Supreme Court didn't seem to deter them from coming to a different conclusion. Well, in that case, Your Honor, the issue was not whether or not such a delay was reasonable or permissible under the law. The Supreme Court's statement in that case was really an observation of the immigration system and potential negative consequences that are prevailing throughout the immigration system. But isn't the court telling us how that reads the pot, so to speak, when it says that someone, quote, someone who was a youngster at the start of the process may be an adult at the end and no longer qualify for immigration status given to minors, close quote? Well, Judge Amber, I think it's also important to note that the course of observation there really is not applicable in this case because, as the court also noted, the long delay is mostly due to visa queues and long waits for an available visa number. Then we come back to Judge Randell's question that they changed one portion of the law in 2013, but they did not change 1255M3. That is true. But the inference, the negative inference, if any, that can be drawn from that really is a weak one, that given the Congress's expressed purpose in enacting 1255M3 and given that it's expressly intended to help individuals, a vulnerable population of individuals, like Carmen and Dario in this case, the inference to be drawn from the 2013 amendments and from Congress's silence really is very strong. So the canon essentially that says to include one is to exclude all others? That is the canon, but it's also a canon that really does not take us very far in this case. Because? Because of the text of the statute, because of congressional intent, because the regulations results really can't be squared with either the text of the statute or with congressional intent. Well, maybe it could. I mean, the idea is that while there's this purpose or this period of cooperation and investigation from whatever occurred, whatever crime occurred to this person, during that three-year time period before they can adjust to LPR status, that's the time period we care about when we want them to be reunited with their family so they'll cooperate more. I mean, that's kind of in the policy statement. So it could be that they're really more concerned about the current visa holder during that three-year period. Wouldn't that be just as reasonable as saying, oh, well, obviously they continue to be concerned after you adjust to LPR? Your Honor, in addition to the idea of not just promoting, you know, the idea of promoting cooperation, Congress also made it clear that there's a humanitarian purpose behind the visa scheme. And the idea is to promote family unity and to help these victims achieve family unity. And it's not just purely a quid pro quo system with the idea being that you only obtain benefits so long as you're useful to an investigation, so long as you can be compelled to cooperate the investigation. And even on that point, the very fact that there is an additional avenue of relief available also promotes cooperation with law enforcement, even in that three-year period that Your Honor mentioned. And so Congress' purpose in enacting the statute I think really goes beyond such a narrow focus. And it's also important to note that even, you know, these absurd consequences are not subtle ones. They're not ones that are unknowable. They're ones that are very clear and necessary and natural consequences of the regulation. Nevertheless, the administrative record here for the H-Act rule contains no explanation, much less a justification for why the regulation is permissible in light of these illogical and unjust consequences, and particularly because there's really no countervailing benefit that the government can point to for the H-Act rule. Isn't this – I mean, you talked about the numbers and the fact that most of these applications occur with current visa holders. I think it's like 6,000 current visa holders and then like 300 adjusting at LPR. So, you know, the moral of the story is during that three-year period, you really need to file for your children. Isn't that – you know, the fact that so few wait is because they know they really need to do it during that three-year period or else they could have a problem. They're at the whim of the agency in terms of processing. Isn't that kind of where we end up? And it's not really that – it's not really that absurd, is it? Well, I think the very fact that Congress saw fit to pass Section 1255.3 is proof that Congress did not intend to limit the category of individuals who are – you know, who should be able to receive relief to the first category. And that Congress recognized that there may be individuals who, like Carmen here, are not able for – whether it's for financial or physical or psychological reasons to reunite their family members in the immediate aftermath of the attack and the incident that led up to the EU visa. And through 1255.3, Congress intended for these other – for these individuals, again, individuals like Carmen, to also be eligible for relief. And I see my time is up, so unless – Okay, Your Honor, time. What is your strongest argument you think that 1255.3 should go your way? The strongest argument? What's your strongest argument? The strongest argument would be, Your Honor, that the text of the statute, nationally read, suggests that the – indicates that the eligibility is to be tied upon the – upon the parents' adjustment status. And certainly, the text of the statute does not compel the result. Well, it says upon the approval of the adjustment, the Director of Homeland Security may adjust the status of a child. So then it depends on the definition of child. So – and as you know, that definition doesn't go your way under the way that it's been put in the regs. So what is your strongest argument that child – the way it's been interpreted in the regulation is incorrect? The strongest argument – What is your strongest argument that the definition of child is incorrect? The definition of child – we're not arguing that the definition of a child is incorrect. The definition of a child – there's no dispute that upon the approval of Carmen's adjustment of status – upon Carmen's own adjustment of status, that Dario met every requirement to be defined as a child. Okay. Then why is the age-out regulation incorrect? Because the regulation imposes a requirement that's not in the face of the statute, that does not appear to be on the statute, which is that the child remains under the age of 21 throughout the adjudication of the child's adjustment of status. That's not a – Go ahead, sir. I'm sorry, Your Honor. And that's not a requirement that appears on the face of the statute. Now, the statute also says a spouse. What if, upon the approval of the adjustment, the person's married, but then by the time it comes to a determination as to the person who's a spouse, they're divorced? Or one dies. Does it matter? Would you stand there, even though that person's divorced, they could still adjust that status? Well, for purposes of the statute, the first clause does indicate that there's authority to adjust the status of such a person. That said, the statute itself, the last factor, the requirement that – or the grant of discretion to adjust status or to deny application for failure to show extreme hardship, that itself. But you're saying when it comes time to adjustment, the agency would say, oh, well, you're no longer a spouse, but at the time that your wife was given your current U visa, you were, so therefore we'll allow you to adjust. Doesn't that seem a little bit absurd? Not necessarily, Your Honor, for two reasons. One is that, again, the agency has discretion to deny the application for failure to show an extreme hardship requirement. It seems entirely plausible, if not likely, that an agency would determine that a former spouse or someone who's not a spouse, there is no extreme hardship for not permitting that former spouse adjustment status. Well, by the same token, if someone's over 21, when it goes to adjust, they might say, well, we're really talking about children and minors and people who are dependent upon this person might go that way. That's more of a statement than a question. We'll get you back around. Thank you. Thank you, Mr. Velasquez. Good morning, Your Honors. May it please the Court. Alexander Velasquez for the government. Your Honors, the Court should affirm the District Court's decision for one simple reason. There is no such thing as an affirmative age-out rule. There's only the plain language of the statute and the Secretary's inability to use federal regulations to expand the scope of her own statutory authority. If we start at the plain text of the statute, as the District Court did, the operative text says, upon approval of adjustment of status under Section 1255M1, the Secretary may adjust the status of a child. That clause, upon approval of adjustment of status, is not linked to the definition or the temporal definition of a child. It's linked to when the statute confers the Secretary with the authority to issue that nonimmigrant visa. So what happens when this plays out in practice? Let's assume a child is 16 and the U visa status is given, and upon approval of the adjustment of status, the person files very shortly thereafter. And there's a delay of over five years, and now the person is 21. What happens then? Well, so to clarify, Your Honor, so was there a 929 submitted concurrently with the parent's 485? Because the regulations do allow that. So it's not just a matter of when the parent adjusts. It's a matter of when certain petitions are filed. So, for example, when Ms. Ivar could have submitted concurrently with her I-485, her application to adjust status, a 929, a petition to have Mr. Contrera classified under the relevant— So if she submitted a 929 in this case, what would have happened? A 929 in this case, so it did take about—I believe it was about eight to nine months to be processed. So there's no guarantee. But there are expedite requests that an individual can file with the agency. Well, this was filed, what, the day before the person turned 21? The 929, I believe—let me just double check. I'm sorry, the initial application only. What was filed? The 929 was filed. So the application to have Mr. Contrera classified under 1255 M-3 was filed the day before his 21st birthday, which means that he was virtually guaranteed to no longer meet the statutory definition of child, regardless of what— When was the 929 filed? That was the 929. And how long after she had adjusted to current U visa? After she—after Ms. Ivar adjusted— Because there had to be a three-year period, then she got LPR, right? So the three-year period, she was actually backdated. So she was granted LPR status in May 2010, and it was backdated—I'm sorry, I'm sorry. She was conferred with UNAN immigrant status in July 2009, which was backdated until November 2006. So then when she submitted her I-485, her application to adjust status, she had had effectively the necessary physical presence for that to be satisfied. So then about two months later—excuse me, from May 2010 to September 2010, that's when the 929 was submitted, September 2010. So between May and September, which is what, five months, six months? If I'm doing my math correctly. But the plain language of the statute, regardless of what the regulation says, is that the secretary may adjust the status of a child. So the fact that even if we look past the 929, we look to the date that Mr. Contrera filed his own application. So what happens in the example that I asked you about, if the person is 16? In other words, a 929, you mentioned, could be filed then, but a 929 was filed here the day before the person turned 21. So assume a 929 is filed when the person is 16, but for some reason the process is delayed for over five years. What happens then? Well, assuming then, Your Honor, that the parent goes on to adjust status, to LPR status, there are other avenues for relief, which I believe Judge Rundell is what you were speaking about. But what happens in this case? Assume for the moment that there are no other avenues of relief. What would happen? Well, I'm sorry. Then if the individual turns 21, then he no longer has a qualifying family relationship. Even though it wasn't the individual's fault for the five-year delay? That's correct, Your Honor. Sometimes the agency regulations, excuse me, the statute, has to define a line between what is a child and what is an adult. And it's also worth noting that that's not what happened here in this case. Understood, but I'm trying to play out the next case. I mean, you could play this, go on, say the person is 10, and for some reason there's an 11-year delay. And you're saying that's too bad, they can't win under 1255 M3 and the regulations that define what is a child. Isn't that correct? I think that's correct, Your Honor. But luckily there are, as I mentioned, other avenues for relief. As soon as you become an LPR, you can file your I-130, and that, depending on the different category the child falls into or the family member falls into, they are able to obtain effectively the same relief that they could. And what are the delay periods on those kinds? Well, this isn't on the, I'm sorry, on the I-130s? Well, it depends, Your Honor. I believe my colleague was correct when he mentioned it was about seven years right now. But it all depends on when the I-130 is filed and when the 485, excuse me, when the visa number becomes available. But I think bringing it back to Section 1255, M3 was not meant to be an extra or, excuse me, it was not meant to be a substitute for the generous provisions under the U-immigrant scheme. It was meant to create this kind of backstop. So that's to say that as soon as a U-1 non-immigrant adjusts to LPR status, a whole host of other, well, not a whole host, another route becomes available to provide the same relief, but you would lose that U-1 petitioning procedure. So Congress enacted 1255 M3 to make sure that even for that small interim period, we're not losing, excuse me, the child or the spouse of the person who adjusted and obtained the more stable immigration status. They don't lose that, the child's, you know, petitioning process. Why did the policy change for someone who was a current U-visa holder and would have qualified at that point? They still have that status, even though they've adjusted to LPR, so they've moved on to the next. But the same principle that animates the U-visa holder situation would still seem to apply, wouldn't it? I don't think so, Your Honor, and that's because once you become a lawful permanent resident, it doesn't matter what you adjust it from because you can't, it's legally irrelevant. So, for example, just to look at this specific context to illustrate it, as a U-1 nonimmigrant, you can have your U-1 status revoked. For example, if the law enforcement agency certifies or explains that you're no longer cooperating with a law enforcement investigation, that status can be revoked, whereas once you adjust to an LPR status, you no longer have that. It's much more simple. She was penalized by doing that? I'm sorry? She was penalized by doing that? Penalized by adjusting to LPR status? Yes. I certainly wouldn't say that, Your Honor. I believe that she herself obtained a much more stable immigration status, which in turn allowed her to become a U.S. citizen, which she is now. But in terms of what we're attempting to do here, which is to get her son to tag along, she's penalized, is she not? I don't think so, Your Honor, because, like I said, there is the other procedure. Understood, but assume for the moment there isn't. If there was not, I think you could say that it was a penalty, but it's really not because Congress is presumed to know the scope of the statute when it legislates. And so when Congress legislates and says you can move into this more stable immigration path, excuse me, more stable immigration status, you gain the I-130 petitioning procedures, the immediate relative petitioning procedures, but you would lose the U-1 procedures. We don't like that you're losing the U-1 petitioning procedures, so we'll give you 1255 M-3, which will still allow you to bring your child or spouse over. And, Judge Rundell, I think that your hypothetical example, the plain language of the spouse example, going into the plain language of the statute, really illustrates exactly why this regulation is a reasonable construction of the statute. If you're an individual spouse on the date that the application is filed, but then you get divorced, then you can no longer really say that that individual, that divorced spouse, is eligible for the benefit under Section 1255 M-3. The individual loses their qualifying family relationship. The only difference is this was a function of divorce in this hypothetical versus a simple aging procedure. And I think that really illustrates that the regulation is simply part of a longstanding administrative tradition of saying that any application for a benefit is a continuing one. You have to be eligible on the date you submit your application, and you have to retain your eligibility all the way through until the date that the benefit is actually granted or adjudicated. And I think that's reflected in other parts of the statute. In the De Osario case, as Your Honor mentioned, the Supreme Court mentioned that that is a perfectly normal operation of the statute. I also think in the most recent June Supreme Court decision, the Hawaii case, Justice Roberts spoke about how an application for a visa is a continuing one, and even if your visa petition is granted, if, for example, when you come to the United States and you're determined to no longer meet the eligibility criteria upon which you were granted that visa, it can be revoked. So I think the notion that an application for a benefit is only measured in terms of the facts on the date that the application was submitted is really not how the INA operates in fact. If we were to hold, assume that we were to hold that the statute here is ambiguous concerning what to do, don't we need to remand under the Supreme Court's Encino-Motocar's decision because DHS didn't give any reasoning or rationale for the age-out regulation, did it? Well, Your Honor, again, I don't think you need to remand. I think that – But was there any reasoning given by DHS for the age-out regulation? DHS did publish in the Federal Register the interim regulation. But is there any reasoning that it gave for that interim regulation? Well, the interim regulation was not considered to be an affirmative age-out protection, so I think – What reasoning did it give? I can't point to a specific page in the Federal Register. And I couldn't find anything either. I can point, however, to the regulation at 8 CFR 103.2B1, which says that all applicants for any benefit request must establish their initial and continuing eligibility. And, of course, that was not specific to these specific U-Visa regulations. But even in making a technical amendment in 2011, DHS explained that this is consistent with long-standing administrative principles going back all the way to Citizens to Preserve Overton Park that says that an application for a benefit request is a continuing one. So although I have not, as Your Honor, been able to locate a specific provision in the Federal Register of the interim regulations explaining the reasoning for this, I think that if you look through the broader scope of how these kinds of benefit applications and all benefit applications are adjudicated, it's perfectly consistent with the normal operation of the INA. The only reason I could see, which was more of a not the real reasoning, was it's a long-standing policy and practice. But that's not a reason as to why they did this. I couldn't find anything. Well, I think, Your Honor, I can speculate. I can obviously offer my own views on it, but I can't substitute for what the regulations say. But I do think that the fact that the Supreme Court has noted already in the De Ossario case most recently that individuals can age out of the benefit applications they seek. And that's simply something that can't be helped. And it's also worth noting, too, Your Honor, that that is not this case. If we're speaking broadly, of course there are always going to be the cases on the fringes where it becomes more difficult. But this is a case where the 929 petition was submitted one day before the individual would no longer be classified as a child under the statute. There were numerous ways for the individual to have the petition considered concurrently along with the principles application. So if you look under the federal regulations, I'm looking at 245.24H1. You could have submitted concurrently. Well, she could have, but she was obviously in a psychological state. Of course. And that's what makes this tragic and kind of distinguishable. During that three-year period, she didn't feel that she was competent to take on caring for a child. And so, therefore, she put it off until she felt she was. Of course, Your Honor. And forgive me, no one wishes to minimize the impact of what happened to Ms. Ivar in this case. But I think if we're looking at whether the regulation itself broadly, categorically, is a reasonable interpretation of the statute, we have to look at not just what did happen below, but also what could have happened. In other words, the other routes that the agency provided to obtain the relief requested. So when the initial 918, the application that Ms. Ivar would have submitted to confer new non-immigrant status, when she submitted that application, she also could have submitted, or an individual in her position, could have also submitted a supplement A, which is an application to have her child categorized to receive derivative status. So that was one opportunity that the agency provided to similarly situated individuals. What is the congressional purpose that's served by construing 1255M3 to allow a child to age out? Well, the congressional purpose in implementing the U visa statute was to protect alien victims of crime and to incentivize their cooperation with law enforcement. And so once you move to Section 1255M3, the scope of that incentive is reduced. And so it's perfectly consistent with the fact that other avenues for relief exist once you become an LPR, to say that you don't get as generous petitioning procedures, the same generous petitioning procedures you did formerly under the U scheme. So I think Congress's intent was to make sure, to keep consistent the different pathways to obtaining a visa. And of course, I'm just speculating on that, but I think that shows that it's consistent across the statutory scheme to show that once you're a U1 non-immigrant, you have these derivative petitions available to you. Once you're a lawful permanent resident, you have these derivative petitions available to you. Once you're a U.S. citizen, you have these petitions available to you. And I think that's how the statute needs to be read and understood, is that this is not just an isolated piece of text. It's amongst a whole host of other provisions of the INA that allow individuals to bring their family members to the United States. Mr. Contreras simply became an adult during the petitioning process, and it was almost guaranteed based on the date that he submitted his application. He was an adult also when he submitted his application to adjust status. So for those reasons, Your Honor, it was lawful for the agency to deny the 485. It was lawful and appropriate for the district court to affirm the agency's decision. And for those reasons, this court should affirm the district court's decision. Thank you. Thank you very much. Mr. Chu, you say it's a weak inference that should be drawn when Congress legislates in one area and is silent as to another. But in Rosello, the court said where Congress includes particular language in one section but omits it in another, generally presumed that it acts intentionally and purposely. The case you cite, Scripps-Howard, for supporting your proposition, really involved a stay and inherent power of the court, where it's not specifically stated that the court has stay power. Nonetheless, it's inherent that the court has stay power, so we don't draw that same conclusion. Do you have any other case that supports your view that this should be a weak inference rather than the presumption that Rosello recited? Your Honor, I believe, and while I don't have the exact case names in front of me, I believe there are many cases that say that speculating from congressional silence is, for example, a venture into speculative unrealities or something to that effect. So there are cases that say that. But there is a principle of statutory construction that the Supreme Court has said uses the word presume. There is. Very strong. There is, Your Honor. But there is also, as in this court's decision in Si Ming Chang, there's also countervailing canons where we presume to not interpret a statute in a way that contradicts congressional purpose. We presume to not interpret a statute in a way that creates absurd results. And so these are other canons and countervailing indications that overcome, really, any inference that can be drawn from congressional silence. And I'd also like to point to emphasize or to respond to two points that the government raised. One is the government noted a few points that the application here really could have been filed earlier, that the application could have been filed concurrently with Carmen's own adjustment status application. That application was filed in March of 2010, which is six months before Dario's birthday. It took the government 19 months and counting to process Plaintiff's paperwork. So the idea that by filing concurrently with Carmen's own application for adjustment status, this could have been voided, it's really belly for the actual timeline of what happened. And also the government points to, in terms of explaining or trying to explain the complete dearth of any rationale for this regulation, the government points to 8 CFR 103.2B1. That regulation, Your Honor, and those statements were promulgated three years after the H.I. rule itself was promulgated. And also in such belated rationale clearly is not any type of valid explanation for the process actually underlying the H.I. rule. And I'd also note, as my last point, the rationale announced in that statement really has no applicability here. The idea that eligibility is contingent on circumstances not changing after an application, it really has no rational application when it comes to an applicant's age, which is a circumstance that necessarily changes after an application, and which is a circumstance that is completely outside of the applicant's control. So unless there are further questions, thank you. Thank you very much. And I want to thank both Davis Polk and the Gibbons firm for taking this matter on pro bono. It is much, much appreciated by us. Is anybody from Debevoise here who wrote to you? I didn't know if they did it as well on a pro bono basis. But, again, you have our deep appreciation. Thank you to both counsel for very well presented arguments. And we'll take the matter under advisement. And we'll call our second case of this morning, number 18-1450.